JUAN R. DETORRES AND JACQUELYN S. DETORRES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
deTorres v. Commissioner
Docket No. 3424-91
United States Tax Court
T.C. Memo 1993-161; 1993 Tax Ct. Memo LEXIS 162; 65 T.C.M. (CCH) 2381; April 14, 1993, Filed *162 Decision will be entered for petitioners. Juan R. deTorres and Jacquelyn S. deTorres, pro sese. For respondent: Portia N. Rose. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
1984
$ 16,128.59
$ 806.43
[1]
1985
12,507.29
625.36
[2]
All section references are to the Internal Revenue Code in effect for the years in question. Petitioners were residents of Houston, Texas, when they filed their petition. All references to petitioner are to Juan R. deTorres. The main issue in this case is whether, for the taxable years 1984 and 1985, petitioners are entitled to the foreign earned income exclusion provided in section 911(a). Inasmuch as we hold that petitioner was not an "employee of the United States or an agency *163 thereof" within the meaning of section 911(b)(1)(B)(ii), but an independent contractor, petitioners are entitled to the foreign earned income exclusion, and there are no underpayments in their Federal income tax for the years at issue. As a result, petitioners are not liable for any additions to tax under section 6653(a) for negligence or intentional disregard of rules or regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. General Background
Petitioner is a U.S. citizen and a civil engineer who graduated from the University of Puerto Rico in 1939. He has spent most of his professional life working in developing countries. For a number of years, petitioner worked for an American consulting engineering firm and was vice president in charge of the firm's South America division. After retiring from that firm, petitioner became vice president of another consulting engineering firm that did work in South America. Over the years, petitioner developed expertise in municipal water and sewage systems. Subsequent to his retirement from the second engineering firm, petitioner became a self-employed sole proprietor, residing and having *164 an office in Puerto Rico, and carried on a practice in which he provided consulting engineering services to various government agencies and private corporations. In November 1983, at age 65, petitioner contracted with the U.S. Agency for International Development (USAID) to work as one of four civil engineering consultants on an emergency disaster relief project in Ecuador, known as the "Emergency Rehabilitation Project". USAID, under the authority of the Foreign Assistance Act of 1961, Pub. L. 87-195, 75 Stat. 424, is the U.S. Government agency that carries out economic assistance programs in friendly developing countries. USAID also conducts humanitarian relief activities in countries suffering natural disasters such as earthquakes, famine, floods, and drought. USAID's Office of United States Foreign Disaster Assistance administers the agency's overseas disaster assistance programs. The office uses other U.S. Government agencies, voluntary and international organizations, and the U.S. private sector to meet the demands of disaster relief, rehabilitation, preparedness, early warning, and mitigation in countries stricken or threatened by natural or manmade disasters. USAID provides *165 technical assistance and training for host government disaster assistance programs, technology transfer for improved prediction and warning systems, and material and personnel for emergency relief and rehabilitation. USAID has three categories of personnel: (1) Direct hires, (2) personal service contractors (sometimes referred to as PSC's), and (3) nonpersonal service contractors (sometimes referred to as NPSC's). Direct hires do not have written employment contracts, but are employed by appointment for open-ended terms. Personnel in the second and third categories, however, provide services pursuant to written contracts of limited duration. The Emergency Rehabilitation Project
The purpose of the Emergency Rehabilitation Project was to rehabilitate and reconstruct the infrastructure of the six coastal provinces of Ecuador damaged or destroyed by flooding associated with "El Nino". [1] The relief project was financed by a $ 6 million loan and $ 6 million grant made available to the Republic of Ecuador by the United States through USAID. *166 The Project Loan Agreement between the United States and Ecuador provided for a $ 6 million aid package designed to finance rehabilitation of Ecuador's coastal and southern agricultural regions affected by El Nino. The Grant Agreement identified six "subprojects" for which the grant funds were to be used. They were: (1) rehabilitation of the agricultural infrastructure, (2) Pichincha Slope protection (i.e., landslide protection), (3) housing reconstruction, (4) water supply and sanitary sewage systems rehabilitation, (5) school repairs, and (6) repairs of electrical transmission systems. The Emergency Rehabilitation Project, as described in the grant agreement, was to be implemented by the Ecuadorean Development Bank, Banco Ecuatoriano de Desarrollo (BEDE) in coordination with Ecuadorean implementing agencies. [2] BEDE acted as the financial agent for the Ecuadorean government and was responsible for ensuring that the grant funds were used by the implementing agencies in accordance with the terms of the Grant Agreement and the six subproject agreements between BEDE and the implementing agencies. *167 In addition to the $ 6 million in aid, the Grant Agreement provided that: To assist BEDE in the monitoring of the project and to provide the implementing institutions with such technical assistance as may be required, A.I.D. will contract several long and short term advisors. These advisors will not be financed from funds provided under the Grant. To facilitate collaboration between A.I.D. and BEDE at the operational level, and to ensure proper technical support for the implementing institutions working in the coastal region A.I.D. will station project personnel and advisors in Guayaquil once the subproject agreements have been executed.
In accordance with this provision, USAID contracted with four consulting engineers, including petitioner, to monitor the various rehabilitation and repair subprojects. Petitioner was the only engineer hired by USAID to monitor the water and sewage subproject. When petitioner arrived in Guayaquil, there were no engineers available to monitor the repairs of the electrical transmission systems, and so petitioner volunteered to work on that subproject in addition to performing his other duties. The other three engineers monitored the various *168 other rehabilitation projects; two worked on the school repairs project and the other monitored flood control work on the agricultural rehabilitation project. The Ecuadorean implementing agency that rehabilitated the water supply and sanitary sewage systems was the Instituto Ecuatoriano de Obras Sanitarias (IEOS). The Ecuadorean implementing agency that repaired the electrical transmission system was EMELEC. BEDE required that these agencies submit, with each of their requests for payment, the certification of a civil engineer that the work had been properly performed. Petitioner was to monitor the work performed by the implementing agencies and to issue final certifications after the work had been satisfactorily completed. [3] BEDE, in turn, submitted the certifications to USAID in support of its applications for grant funds. *169 Under the grant agreement, BEDE was to provide and operate offices in Guayaquil to support the project activities. The cost of the office and BEDE's other operational expenses were paid from nongrant "counterpart funds" provided by the Ecuadorean government. The office used by petitioner and the three other engineers was located in the Ecuadorean Ministry of Agriculture building in Guayaquil. The Ecuadorean implementing agencies were headquartered in the capital city, Quito. However, all the agencies had regional offices in all six provinces of Ecuador. Contractual Relationship between Petitioner and USAID
On November 1, 1983, petitioner and USAID executed a contract for services. The contract was prepared in accordance with the provisions of 41 C.F.R., chapter 7, Appendix F (1983). [4] As required by Appendix F, the cover sheet of the contract was "Attachment A", USAID standard form 1420-36 entitled "Contract With a U.S. Citizen or U.S. Resident for Personal Services Abroad". In addition, the contract included Attachment B, USAID form 1420-37 entitled "General Provisions" and Attachment C, USAID form 1420-38 entitled "Additional General Provisions". Appendix F states *170 that "personal service contracts" establish an employer-employee relationship between USAID and the contractor. Appendix F also states that "nonpersonal service contracts" establish an independent contractor relationship. By its terms, Appendix F applies to AID contracts with U.S. citizens or U.S. residents to provide assistance abroad to cooperating countries and regional organizations under contracts which establish an employer-employee relationship. Attachment A [(the cover sheet)] is designed to establish that relationship. [41 C.F.R., ch. 7, app. F, sec. 3(a) (1983).]
Appendix F also states that it does not apply to contracts with U.S. citizens or residents that establish independent contractor relationships, i.e., nonpersonal service contracts. According to Appendix F, such contracts are covered under AID Handbook *171 14 -- Procurement Regulations. The procurement regulations found in Handbook 14 are identical to the provisions of 41 C.F.R. chapter 7, supra. In addition to the cover sheet, General Provisions, and Additional General Provisions, the contract included a section entitled "Statement of Duties", which described petitioner's responsibilities. The Statement of Duties, unlike the General Provisions and Additional General Provisions, which were boilerplate and attached as standardized forms, was negotiated by petitioner and USAID and was written specifically for his contract. The Statement of Duties reads as follows: A. General Statement of Purpose of Contract
The contractor [(i.e., petitioner)] will assist with the technical monitoring of construction, repairs, installation of equipment and fiscal control of USAID/E Grant funded Emergency Rehabilitation Project. B. Statement of Duties to be Performed
The principal duties involve monitoring and expediting of the Water and Sanitation Emergency Repairs and Improvement Component of A.I.D. Grant Agreement 518 0046. In carrying out this responsibility, the contractor will work closely with the Instituto Ecuatoriano *172 de Obras Sanitarias (IEOS) in assuring that technically, administratively and fiscally sound procedures are followed for the construction and rehabilitation of water and sewer systems under the project. "Monitoring" will include all work whether by IEOS force account or IEOS contracted construction or repair. The contractor will also assist IEOS in the preparation of specifications for equipment and commodity purchases and review model contract documents. Monthly reimbursement requests from IEOS will be reviewed and approved in writing by the contractor. The contractor will report directly to the Coordinator for the Emergency Rehabilitation Project in Guayaquil and will prepare a quarterly report that shall include project progress, problems encountered, suggested solutions and other information that the contractor may consider as relevant to the performance of his duties.
On September 25, 1984, petitioner and USAID executed an amendment to the November 1, 1983, contract (first amendment) that, among other things, slightly modified the Statement of Duties provision. While petitioner was working with BEDE, he voluntarily assumed additional responsibilities for the Emergency *173 Rehabilitation Project, monitoring the electrical transmission system repairs project and the El Guasmo Rehabilitation Project, a project, not otherwise described in the record, developed by petitioner and the City of Guayaquil Public Works Department. Petitioner also assumed the duty of Project Coordinator, in which capacity he acted as liaison between the implementing agencies, BEDE, and USAID. On December 12, 1985, petitioner and USAID executed another amendment to the contract (second amendment) to reflect the scope of the work petitioner had actually performed during the second half of 1985. USAID did not assign petitioner to work on any additional projects not specified in the original contract. The substituted Statement of Duties reads as follows: Statement of Duties
The Contractor will assist the Banco Ecuatoriano de Desarrollo (BEDE) and the Agency for International Development (A.I.D.), Ecuador, with the coordination, administration and fiscal control of A.I.D. Grant Agreement 518-0046 Emergency Rehabilitation Project and 518-F-043 (Loan). The Contractor also will assist in monitoring and expediting the Water Supply and Sanitation Projects and El Guasmo Rehabilitation *174 Project, to be implemented under Project No. 518-F-043-1 (Loan).
A. As Project Coordinator, the principal duties involve the following: 1. The Contractor will act as liaison between the field operations and the Banco Ecuatoriano de Desarrollo (BEDE) and the Agency for International Development (A.I.D.). 2. The Contractor will coordinate work performed and be responsible for the contracted AID/Ecuador Mission technical staff and for developing administrative and operating procedures applicable to the Projects. 3. In collaboration with contracted technical staff and Ecuadorean government counterpart agencies, supervise preparation of program schedules and budget estimates for proposed Projects. 4. Collaborate with Ecuadorean counterparts and A.I.D. contracted technical staff in summarizing monthly disbursement requests and quarterly progress reports for submitting to BEDE and USAID/Ecuador. 5. With technical staff assigned to Guayaquil Project Office, develop system of office services and logistical support for field personnel. 6. Supervise ERP Project funded support personnel of the USAID/Guayaquil Office. 7. Under the A.I.D. Grant Agreement 518-0046, *175 supervise the implementation of, and coordinate the emergency relief, rehabilitation and reconstruction activities still outstanding as of this date, in 1) Water Supply and Sanitation Emergency Repair, 2) School Repair and Reconstruction and 3) Repair of Electrical Transmission Systems. 8. Under the A.I.D. add-on project 518-F-043-A (Loan) supervise the implementation of, and coordinate, the construction work to be performed in 1) Water Suply [sic] and Sanitation Projects and 2) El Guasmo Rehabilitation Project.
B. As monitor of the implementation of Water Supply and Sanitation Projects and for El Guasmo Rehabilitation Project, the principal duties involve the following: 1. In close cooperation with implementing agencies, identify and check each proposed project to establish priorities and submit to Coordinating Committee BEDE - A.I.D. - AGENCY for approval. 2. In coordination with the implementing agencies, prior to commencement of work, the contractor shall review and approve plans, specifications and contract documents as applicable to assure compliance with A.I.D. requirements and sound engineering construction practices. 3. Exercise general supervision *176 of construction through periodic visits to job sites. 4. Maintain liaison with implementing institutions through visits to their main offices, joint field trips, mail and/or telephone contact as required. 5. Assist implementing Agencies in the preparation of specifications for equipment and commodity procurements and review model contracts. 6. Provide technical assistance and general guidance to counterpart engineers and contractors as required, for design or the construction phase of work. 7. Prepare and submit brief monthly reports. These reports shall complement the financial reports of BEDE and the progress reports of the implementing institutions. The purpose of these reports is primarily to identify difficulties encountered, to record and how [sic] they were resolved, to present recommended solutions if action required was beyond authority of the Monitor, and to supply other information considered relevant to the implementation of the project.
C. Pertaining to the execution of monitoring, the contractor shall be solely responsible for all technical aspects of the work; for the scheduling, planning and implementation of the necessary field or office inspection *177 trips; supervision of office and/or field operations; for maintaining liaison with implementing agencies and BEDE; and for the direction and supervision of project personnel assigned to assist in monitoring the proposed work. D. The Coordinator/Monitor will report directly to the Project officer, AID/Quito.
Article IV of the original contract provided that USAID would provide petitioner with certain logistical support: LIAISON OFFICER AND LOGISTIC SUPPORT
A. The Chief, Office of Development Resources will be the Contractor's principal liaison officer. The USAID/Ecuador Mission Director will be ultimately responsible for the Contractor. B. LOGISTIC SUPPORT
AID will provide the following logistic support: office space, office equipment, furnished quarters with curtains and utilities, transportation in Cooperating Country, transportation to and from Country, secretarial services, vehicles (official), and travel arrangements/tickets. * Additional Facilities Available from other sources, will be the Commissary, if approved by the IPS Board.
The first amendment modified Article IV to read as follows: Article IV, Liaison Officer and Logistical *178 Support
a) Delete in its entirety and replace in lieu thereof: A.1 Contractor will report directly to the Emergency Rehabilitation Project Officer and maintain continuous communication with IEOS (Instituto Ecuatoriano de Obras Sanitarias) field engineer and administrative offices. A.2 AID Liaison Officer
USAID/EcuadorDevelopment Resources Officer, Chief Engineering Officer, and Mission Director will be ultimately responsible for the Contractor.
Although the contract stated that USAID would provide petitioner logistical support, such as office space and equipment, inland transportation, and secretarial assistance, it was BEDE, with its own nongrant funds, that provided petitioner with office space in Guayaquil. Moreover, petitioner made all his own arrangements to travel to the implementing agencies' regional offices and the various sites around Ecuador where the rehabilitation project was being implemented. The Ecuadorean implementing agencies, rather than USAID, provided petitioner the facilities he needed to perform his duties, such as laboratory equipment and secretarial services. Petitioner received little if any direct logistical support from USAID while *179 he was in Ecuador. Article III of the original contract, dealing with the petitioner's budget and compensation for his 18-month tour of duty, provided, in part, that USAID would pay petitioner as follows: First Year
U.S. Dollars
1.
Salary
a. (Base Pay)
Annual Salary
50,010
18 months
US $ 75,015
b. Guayaquil Differential   (15% of Base Pay)
11,252
c. Insurance  (1) Health & Life Insurance maximum      per annum
263  (2) FICA: 6.7% of the first 31,800      (AID employer) not payable to      Contractor [5]
3,195
2.
Travel and Transportation
a. Travel from San Juan, Puerto Rico,
to Guayaquil, Ecuador and
return.
2,046
b. Transportation of HHE - limited
shipment not to exceed 2,500 lbs.
net, unaccompanied baggage of 450 lbs.
gross, and privately owned vehicle,
from San Juan, Puerto Rico, to
Guayaquil, Ecuador and
return.
14,000
c. Storage of HHE   5,000 lbs. net.
1,800
d. In-country travel
4,000
3.
Miscellaneous, pre-contract expenses
Communications: telephone calls, telegraph,
physical examinations, etc.
2,429      Total First 18 Months:
$ 114,000
*180 Under these terms, for the year 1984 USAID had budgeted $ 57,686.83 for petitioner's base pay, Guayaquil differential, and health and life insurance. Petitioner was to render an accounting of all expenses and obligations he incurred and to notify the USAID Contracting Officer if he needed more money to perform the duties required under the contract. In the first amendment, petitioner and USAID agreed to increase the amount budgeted under the contract from $ 114,000 to $ 153,898. The amendment also retroactively changed the effective date of the contract to November 29, 1983, from November 1, 1983, and extended the estimated completion date from April 30, 1985 to December 26, 1985. This had the effect of extending petitioner's tour of duty from 18 months to 25 months. General Provisions
Paragraph 11 of the General Provisions, the boilerplate provisions required by Appendix F and attached to the original contract as standard AID form 1420-37, provided that petitioner would submit vouchers [6] to the USAID controller for payment once each month, or at more frequent intervals if approved by USAID. Petitioner was to provide a detailed invoice for each amount claimed for compensation, *181 travel and transportation, and reimbursable expenses and state the period covered, days worked, and leave taken. All claims for compensation were to be approved by the USAID Project Officer. The first voucher submitted was to have an executed Form W-4 attached to it. The General Provisions also provided that petitioner would work 40 hours per week, but did not specify which hours or days he was supposed to work; that he would earn vacation and sick leave at the standard Government rate of 13 workdays per year, or 4 hours every 2 weeks; that he could take leave without pay only with the approval of the Contracting officer or Mission Director; and that he was entitled to all holidays granted to U.S. citizen direct-hire employees. In fact, petitioner set his own work and travel schedules and was not subject to control by USAID as to when, where or how he performed his duties. The General Provisions also included a paragraph governing *182 petitioner's conduct while in Ecuador. It provided that: (c) Code of Conduct
The Contractor shall, during his tour of duty under this Contract, be considered an "employee" * * * for the purposes of, and shall be subject to, the provisions of AID Handbook 24, Chapter 3. The Contractor acknowledges receipt of a copy of said provisions by his acceptance of this Contract. [Emphasis added.]
There is no other reference in the contract that states that petitioner was an "employee" of USAID. Unlike direct hire employees, personal service contractors do not receive life and health insurance or retirement benefits from USAID. Instead, USAID makes contributions for life and health insurance directly to the contractor instead of the insurance carrier. The contractor is responsible for obtaining his own life and health insurance and casualty insurance. Under the General Provisions, USAID could not pay petitioner more than $ 175 per year for life and health insurance. Under the terms of the contract, USAID budgeted to pay petitioner $ 263 for health and life insurance coverage over the initial 18-month period petitioner was in Guayaquil. Under the terms of the first *183 amendment, USAID was to pay petitioner an additional $ 102 for health and life insurance for the 7 extra months he stayed in Ecuador. USAID also provided petitioner with workmen's compensation coverage in accordance with the Federal Employees Compensation Act. Under paragraph 16 of the General Provisions, USAID could terminate the contract with petitioner for convenience by giving 30 days' notice, or by giving 10 days' notice if petitioner breached the contract. Use of the PSC Form and Confusion at USAID
USAID had two formats for hiring service contractors: (1) Personal service contracts and (2) nonpersonal service contracts. When USAID used the PSC format, it followed Appendix F and, in general, treated the hired party as an employee. When USAID used the NPSC format, it did not follow Appendix F and treated the hired party as an independent contractor. However, during the years in issue, USAID often resorted to using the simpler standardized PSC format in emergency situations, even though it intended to hire an independent contractor. This enabled USAID to avoid the time-consuming process of having to accept competing bids from various contractors as required under its *184 procurement regulations. The use of the convenient and simple PSC form contract, however, caused uncertainty and confusion with respect to the tax treatment of the contractors. When petitioner started work for USAID, he was asked to complete a Form W-4 withholding certificate. It is not clear from the record whether petitioner completed that form. It was petitioner's understanding that he was exempt from income tax withholding because, as a consulting engineer, he was an independent contractor. However, early in 1985, after an audit by USAID's inspector general, USAID determined that its Quito office had erroneously failed to withhold taxes from the pay of personal service contractors. On February 20, 1985, USAID's controller sent all U.S. citizen PSC's Forms W-4 and SS-8 [7] and asked them to complete these forms. Petitioner filed the W-4, as requested, but claimed thereon that his compensation was exempt from Federal income tax because he was a "self-employed consulting engineer". There is no evidence whether petitioner or USAID ever prepared Form SS-8 with respect to petitioner's status as a USAID employee or independent contractor. *185 USAID's Tax Treatment of Petitioner
The General Provisions of the original contract provided that: 7. Social Security and Federal Income Tax F.I.C.A. contributions and U.S. Federal Income Tax withholding shall be deducted in accordance with regulations and rulings of the Social Security Administration and the U.S. Internal Revenue Service, respectively.
USAID did not issue petitioner a Form W-2 for either 1984 or 1985 and did not withhold from petitioner's pay any amounts for Federal income taxes. Instead, USAID reported petitioner's compensation on Form 1099-MISC. USAID also did not withhold any amounts from petitioner's pay for social security taxes (FICA contributions), contrary to section 7 of the General Provisions of the contract, and did not pay the employer's share of such taxes, contrary to the terms of Article III of the contract. For the taxable year 1984, USAID paid petitioner $ 67,113.11 in compensation, which it reported in box 7 of Form 1099 -- MISC, marked "nonemployee compensation". In addition to paying petitioner for his consulting engineering services, USAID also paid petitioner $ 4,500 for housing costs. Inasmuch as USAID reported on the Form *186 1099-MISC that it paid $ 9,426.28 more than the amounts it budgeted for 1984 for petitioner's "salary", Guayaquil differential, and health and life insurance, it is not clear whether the amount reported on the Form 1099-MISC included the housing costs or any other "taxable" items. [8]
For 1985, USAID paid petitioner $ 54,000 in compensation and $ 6,000 for housing costs. There is no Form W-2 or Form 1099 for the year 1985 in the record. However, even after petitioner had filed Form W-4, as described above, USAID continued to pay petitioner in the same manner as previously; it did not withhold or pay any amounts for income or social security taxes. Petitioner's Income Tax Reporting
On his Federal *187 income tax return (Form 1040) for the taxable year 1984 petitioner reported his address as Guayaquil, Ecuador, and $ 71,613.11 ($ 67,113.11 + $ 4,500) in compensation and housing cost allowance paid by USAID. On the line for other income, petitioner claimed an offsetting deduction of $ 71,613.11 and attached Form 2555 electing the foreign earned income exclusion. [9] On that form, petitioner stated that he was a self-employed consulting engineer and gave his U.S. and foreign addresses. Petitioner stated that he qualified for the foreign earned income exclusion because he satisfied the physical presence test, that he was a U.S. citizen, and that his tax home for 1984 was Guayaquil, Ecuador. Petitioner also attached to his 1984 income tax return a Schedule C (Profit or (Loss) from Business or Profession) stating that his 1984 self-employment income was $ 71,613.11. Petitioner did not claim any deductions on Schedule C. Petitioner also attached Schedule SE to his return and computed his selfemployment tax for 1984 as $ 4,271.40. [10] Petitioner computed his Federal income tax on all his other taxable income as $ 578. Petitioner paid a total of $ 4,682.40 in quarterly estimated tax *188 payments for 1984 and, when he filed his 1984 return, reported that he owed an additional $ 167 in tax. Petitioner reported his Federal income tax liability for 1985 in similar fashion. Petitioner reported $ 54,000 as compensation from USAID and $ 6,000 in housing cost allowance, for a total of $ 60,000. On the line for other income, petitioner claimed an offsetting deduction of $ 60,000 and attached Form 2555 to his return. He computed his tax on his other taxable income as $ 378 and his self-employment *189 tax as $ 4,672.80. Petitioner paid $ 5,320 in quarterly estimated taxes for 1985 and claimed a $ 269.20 refund. With the exception of quarterly payments of self-employment tax, petitioner did not pay Federal income tax on any of his USAID compensation or housing cost allowances for the years 1984 and 1985. Respondent determined deficiencies with respect to the compensation for services, but not with respect to the housing cost allowances, which respondent determined to be nontaxable under section 912. Ecuadorean Taxes
The grant agreement between the United States and Ecuador provided, in part, that: Section B.4. Taxation
(a) This Agreement and the Grant will be free from any taxation or fees imposed under the laws in effect in Ecuador. (b) To the extent that (1) any contractor, including any consulting firm, any personnel of such contractor financed under the Grant, and any property or transaction relating to such contracts and (2) any commodity procurement transaction financed under the Grant, are not exempt from identifiable taxes, tariffs, duties or other levies imposed under laws in effect in Ecuador, the State [of Ecuador] will, as and to the extent provided *190 in and pursuant to Project Implementation Letters, pay or reimburse the same with funds other than those provided under the Grant.
Petitioner believed that this provision exempted his USAID compensation from Ecuadorean taxation. He did not pay any taxes to the government of Ecuador for 1984 or 1985. ULTIMATE FINDINGS OF FACT Petitioner is a professional consulting engineer who acted as such, rendering services requiring a special skill, on the Emergency Rehabilitation Project. USAID did not have the right or ability to control the manner in which petitioner performed his work and did not exercise actual control over petitioner. USAID and petitioner did not intend that petitioner was to be an employee of USAID. Petitioner was an independent contractor rather than an employee of USAID during the taxable years in issue. OPINION A. Section 911: Foreign Earned Income Exclusion
Section 911 provides, in relevant part: (a) Exclusion from Gross Income. -- At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for *191 any taxable year -- (1) the foreign earned income of such individual, and (2) the housing cost amount of such individual. (b) Foreign Earned Income. -- (1) Definition. -- For purposes of this section -- (A) In general. -- The term "foreign earned income" with respect to any individual means the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual [11] during the period described in subparagraph (A) or (B) of subsection (d)(1) [(defining "qualified individual")], whichever is applicable. (B) Certain amounts not included in foreign earned income. -- The foreign earned income for an individual shall not include amounts -- * * * (ii) paid by the United States or an agency thereof to an employee of the United States or an agency thereof, * * *
*192 USAID is an agency of the United States, and petitioner was a "qualified individual" within in the meaning of section 911(d)(1) for the years in issue. The issue in this case is whether petitioner was an employee of USAID during the years in issue or whether he was an independent contractor. This is purely a factual question. Air Terminal Cab, Inc. v. United States, 478 F.2d 575, 578 (8th Cir. 1973); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988); Packard v. Commissioner, 63 T.C. 621 (1975)). 1. Common Law Test
Although neither section 911 nor any other provision of Subtitle A contains a definition of the term "employee", it is clear that Congress intended the term to be understood in accordance with its common law meaning. Matthews v. Commissioner, 907 F.2d 1173, 1175 (D.C. Cir. 1990), affg. 92 T.C. 351, 355-357 (1989). The test used to determine whether an individual is an independent contractor or an employee was clearly stated *193 by the Supreme Court in two recent cases. The Court said that: In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. [Nationwide Mut. Ins. Co. v. Darden, 502 U.S.    ,    , 112 S. Ct. 1344, 1348 (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-752 (1989); fn. refs. omitted.)]
This Court applies the same common *194 law test in deciding whether an individual is an employee or an independent contractor for purposes of section 911. Matthews v. Commissioner, 92 T.C. at 360; Marckwardt v. Commissioner, T.C. Memo. 1991-347; Juliard v. Commissioner, T.C. Memo. 1991-230; Matt v. Commissioner, T.C. Memo. 1990-209. [12]
In determining whether an individual is an "employee" within the meaning of a Federal statute, Federal courts rely on the general common law of agency and not the law of any particular State. Community for Creative Non-Violence v. Reid, supra at 740-741, 752 n.31 *195 (stating that the U.S. Supreme Court generally looks to the Restatement of Agency 2d for guidance on this question).[13] The common law test contains "no shorthand formula or magic phrase that can be applied to find the answer, * * * all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." NLRB v. United Ins. Co. of America, 390 U.S. 254, 258 (1968). Although the presence or absence of any one factor is not necessarily dispositive, the primary test is whether the person for whom the work is performed has the right to control the activities of the individual whose status is in issue, not only as to the result but also as to the means and method to be used for accomplishing the result. Nationwide Mut. Ins. Co. v. Darden, supra; Packard v. Commissioner, supra at 629; Marckwardt v. Commissioner, supra.Control overlaps many of the other factors and is considered the "master test" of an employment relationship. Matthews v. Commissioner, 92 T.C. at 361; Juliard v. Commissioner, supra. As *196 Judge Learned Hand stated in Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943): "The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said". *197 2. Control: The Master Test
Petitioner argues that USAID never had the right or ability to, nor did it in fact, exercise sufficient control over him to render him an employee of USAID. Respondent contends that under the contract between petitioner and USAID, USAID had the right to control petitioner's work in Ecuador. Respondent also argues that USAID exercised actual control over petitioner. We agree with petitioner on both of these points. In Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. at 233, we said that "A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist." The analysis therefore focuses on the actual relationship between the contracting parties and not simply on what the written agreement says. We therefore look at the totality of the facts and circumstances to determine the nature of the relationship between petitioner and USAID. As set forth in our Findings of Fact, the agreement between petitioner and USAID, and the two amendments thereto, contained various provisions *198 relating to the rights and duties of the parties to the contract. The Statement of Duties was the only provision in the original agreement that specifically dealt with petitioner's activities in Ecuador. It provided, in part, that he would: report directly to the [USAID] Coordinator for the Emergency Rehabilitation Project in Guayaquil and will prepare a quarterly report that shall include project progress, problems encountered, suggested solutions and other information that the contractor may consider as relevant to the performance of his duties.
The second amendment, which reflected the scope of the work petitioner had actually performed during the latter part of 1985, provided that petitioner, as Project Coordinator, would Collaborate with Ecuadorean counterparts and A.I.D. contracted technical staff in summarizing monthly disbursement requests and quarterly progress reports for submitting to BEDE and USAID/Ecuador.
As monitor of the water supply and sanitary sewage system rehabilitation project and the El Guasmo rehabilitation project, petitioner was to "Prepare and submit brief monthly reports" that were intended to complement BEDE's financial reports and *199 the progress reports of the implementing agencies. The purpose of the reports was primarily to identify difficulties encountered, to record and how [sic] they were resolved, to present recommended solutions if action required was beyond authority of Monitor, and to supply other information considered relevant to the implementation of the project.
Petitioner was to deliver these reports to the Project Officer at USAID's Quito office. The obligation to make reports is an indication of an employer-employee relationship. See Juliard v. Commissioner, T.C. Memo. 1991-230. Respondent contends that these provisions gave USAID sufficient rights to control the way petitioner performed his job as to render him an employee of USAID. We disagree. These paragraphs merely state that petitioner was to apprise USAID as to the progress of certain rehabilitation subprojects in the form of quarterly and monthly reports, a duty that consulting engineers typically have. See American Society of Civil Engineers, Manual No. 45, "Consulting Engineering: A Guide for the Engagement of Engineering Services" at 9 (1972). [14] These provisions also state that petitioner *200 should suggest solutions to problems he encountered. Petitioner's reports were for USAID's informational benefit and allowed USAID to monitor the use of the grant and loan funds by the Government of Ecuador and its agencies. The reports were not the mechanism by which USAID supervised or controlled the way petitioner performed his duties as engineering monitor of any of the rehabilitation projects or as Project Coordinator. The frequency of reports is significant. Petitioner was only required to submit quarterly and monthly reports to USAID, not daily or weekly reports. Again the monthly reports tracked *201 BEDE's financial reports and the progress reports of the implementing agencies and were not intended to provide a basis for supervising petitioner's activities. The second amendment to the contract reformulated the Statement of Duties to reflect the additional responsibilities that petitioner had assumed primarily on his own initiatives, and there is no indication in that 2-page amendment that USAID gained the right to control or supervise petitioner's activities. To the contrary, the Statement of Duties provides that petitioner was to have substantial discretion in the way he conducted his activities. The second amendment of the Statement of Duties provides that petitioner, as Project Coordinator, had broad supervisory authority over the administration and implementation of the Emergency Rehabilitation Project and acted as liaison between the field operations and the Banco Ecuatoriano de Desarrollo (BEDE) and the Agency for International Development (A.I.D.)
As monitor of the water supply and sanitary sewage systems project and the El Guasmo project, petitioner was solely responsible for all technical aspects of the work; for the scheduling, planning and implementation *202 of the necessary field or office inspection trips; supervision of office and/or field operations; for maintaining liaison with implementing agencies and BEDE; and for the direction and supervision of project personnel assigned to assist in monitoring the proposed work.
While it is arguable that, as Project Coordinator, petitioner assumed a position in USAID's bureaucratic hierarchy, the contractual language in the second amendment describing petitioner's duties, coupled with the evidence of the way petitioner carried out his activities, indicates that USAID did not have control over petitioner's work and that petitioner was an independent contractor rather than an employee of USAID. As Project Coordinator, petitioner served as a liaison, working between and coordinating the efforts of the Ecuadorean implementing agencies, BEDE, and USAID. In that capacity, petitioner was not working for USAID as its employee, but acting as an intermediary. In this sense, petitioner worked for the Emergency Rehabilitation Project, which was funded by the United States Government through its agency, USAID. The Emergency Rehabilitation Project, however, was not an agency of the United States, *203 but a cooperative undertaking by the United States and Ecuador. Respondent argues that petitioner, as a civil engineer and skilled professional, required little actual supervision, so that the significance of the control test is minimized. Although an employer's control over a professional is more generalized than its control over a nonprofessional, James v. Commissioner, 25 T.C. 1296, 1301 (1956), the control test is not thereby rendered meaningless when testing the employment status of professional contractors. Moreover, where an individual is hired because of highly specialized skills, the individual is more likely to be an independent contractor rather than an employee. Metcalf & Eddy v. Mitchell, 269 U.S. 514, 520-521 (1926); 1 Restatement, Agency 2d, sec. 220(2)(b) and (d) (1958). While highly skilled professionals often work as employees of firms, as petitioner did before he became a self-employed sole proprietor, the fact that an individual is hired on account of his specialized skill to work on a specific project for a defined period of time is more consistent with his being an independent contractor than *204 an employee, even though there is less need to supervise such an individual than an unskilled laborer. While petitioner was in Ecuador, he worked closely with BEDE and the Ecuadorean implementing agencies. Petitioner was not supervised by USAID, USAID did not instruct petitioner to visit particular project sites, and USAID did not set standards petitioner had to follow on a daily basis. This contrasts with the taxpayers in Juliard v. Commissioner, T.C. Memo. 1991-230, and Matt v. Commissioner, T.C. Memo. 1990-209. Respondent points out that petitioner, in order to be paid, had to submit monthly vouchers to USAID. The vouchers stated how many days and hours petitioner had worked and what expenses he incurred. The vouchers had to be approved by a USAID officer and then processed before petitioner was paid. Respondent argues that this voucher system indicates that USAID had control over petitioner. However, petitioner has shown that the vouchers were approved by a variety of USAID personnel who were not familiar with his work, and that they were processed in a routine manner. In addition, the vouchers appear to us *205 be similar to the bills on account that would be periodically rendered by a professional to a client. Apart from the stipulated exhibits, respondent introduced two additional pieces of evidence that were intended to show that petitioner was under the supervision and control of USAID. Petitioner objected on hearsay grounds to introduction of both of these documents. We sustain petitioner's objections under Rules 801, 802, and 803 of the Federal Rules of Evidence and have disregarded these documents. Respondent's witness, Patricia A. Bullock, a USAID procurement policy analyst and a 27-year employee of the agency, testified that, in the late 1980s, the IRS detected what it regarded as an abuse of section 911 by Federal contractors working overseas. The problem arose at agencies, such as USAID, whose officials the IRS regarded as having been lax in honoring contractors' claims of entitlement to tax exempt status under section 911. See, e.g., Marckwardt v. Commissioner, T.C. Memo. 1991-347, Juliard v. Commissioner, supra; Matt v. Commissioner, supra.This tax problem became an embarrassment to USAID, which *206 tried to correct it, in part, by cooperating with the IRS in its examination of USAID contractors. Both of respondent's exhibits in question are documents prepared by USAID officials in 1989, at the request of the IRS and after it started examining the income tax returns of over 500 USAID personal service contractors. Respondent's exhibit O is a copy of handwritten notes about petitioner's employment status, prepared by Raymond Potocki. Mr. Potocki is a USAID contracting officer who worked at USAID headquarters in Washington, D.C. under Ms. Bullock but who never had any contact with petitioner. The notes relate to telephone conversations Mr. Potocki had with USAID personnel concerning petitioner's employment status with USAID during the years in question as it pertained to petitioner's qualification under section 911. Mr. Potocki's notes are out-of-court statements offered for the truth of the matters asserted therein and are hearsay. Fed. R. Evid. 801(c). Respondent's exhibit O does not fall under any hearsay exclusion or exception and is therefore inadmissible. Fed. R. Evid. 802, 803, 804. [15]
*207 The other document respondent introduced, respondent's exhibit P, is likewise inadmissible hearsay. That exhibit is a copy of a letter from USAID's Assistant General Counsel for Employee and Public Affairs, Jan Miller, dated June 25, 1989, addressed to Mr. Richard Ward of the IRS. [16] The letter deals specifically with petitioner's employment and tax status and attempts to marshal the arguments that led to the conclusion that petitioner was an employee of USAID during the years in issue. Respondent did not give petitioner adequate notice of the existence of this document or of her intent to use it as evidence, and it lacks circumstantial guarantees of trustworthiness. Respondent's exhibit P is hearsay, does not fall under any of the hearsay exceptions, and is therefore inadmissible. Id.
From the admissible evidence presented in this case, we conclude that USAID did not have the right or ability to control petitioner's activities or the way he performed them *208 during the years in question. [17]
3. Other Factors
a. Work and Leave Schedule and Termination
Respondent, in support of her argument that petitioner was an employee of USAID and not an independent contractor, points to the sections in the General Provisions of the contract that provided for a 40-hour workweek and accrual of annual and sick leave at standard Government rates. The General Provisions also provided that USAID could terminate the contract for convenience after giving 30 days' notice or for cause after giving 10 days' notice. In Marckwardt v. Commissioner, supra, *209 and Juliard v. Commissioner, supra, we stated that these contract provisions tended to show that the taxpayer was an employee rather than an independent contractor. However, we must evaluate the relationship between petitioner and USAID in light of all the facts and circumstances and not on the basis of a few select facts. Nationwide Mut. Ins. Co. v. Darden, supra; see Juliard v. Commissioner, supra; Matt v. Commissioner, supra.
First, the record indicates that petitioner determined the hours he worked despite the requirement that he work 40 hours a week; this was not a 9-to-5 job. This conclusion is further supported by the fact that, under the voucher system, petitioner would only be paid for the billable hours he reported on the vouchers. Second, as petitioner points out, under the USAID procurement regulations, USAID could terminate a contract with a nonpersonal services contractor for convenience just as easily as it could terminate a contract with a personal services contractor. As explained in the USAID procurement regulations, 41 C.F.R. subpart 7-8.2 (1983), the Foreign Aid and Related Agencies Appropriations *210 Act (1962), Pub. L. 87-872, sec. 110, 76 Stat. 1163, 1166, and subsequent appropriations acts, have imposed the following requirement: None of the funds appropriated or made available pursuant to this Act for carrying out the Foreign Assistance Act of 1961, as amended, may be used for making payments on any contract for procurement to which the United States is a party entered into after the date of enactment of this Act which does not contain a provision authorizing the termination of such contract for the convenience of the United States.
See also 48 C.F.R. subpart 749.1 (1992) (same). Inasmuch as USAID could terminate nonpersonal service contracts, i.e., those deemed by the USAID regulations to create an independent contractor relationship, just as easily as it could terminate personal service contracts deemed to create an employer-employee relationship, the termination-for-convenience provision found in the General Provisions has little significance. Moreover, as petitioner points out, the client's unilateral right to terminate a contract is common in consulting engineering agreements, as it is in other arrangements for professional services. American Society of Civil *211 Engineers, Manual No. 45, "Consulting Engineering: A Guide for the Engagement of Engineering Services" at 19 (1972). b. Withholding Taxes
In each of the cases of a USAID contractor whose claim to the section 911 exclusion we rejected, Marckwardt v. Commissioner, T.C. Memo. 1991-347; Juliard v. Commissioner, T.C. Memo. 1990-230; Matt v. Commissioner, T.C. Memo. 1990-209, USAID withheld Federal income taxes and social security taxes from the taxpayer's pay, and paid the employer's share of social security taxes. USAID also issued each of those taxpayers a Form W-2 reporting his or her income and withholding. In contrast, USAID did not withhold any amounts for Federal income taxes or social security taxes from petitioner's pay, did not pay the employer's share of social security taxes, and did not issue Form W-2. Instead, USAID issued petitioner a Form 1099-MISC, the form commonly used to report payments to independent contractors and reported petitioner's pay as "nonemployee compensation". Unlike the taxpayers in the three abovementioned cases, see especially Marckwardt v. Commissioner, supra, [18] *212 petitioner filed Schedule SE with his 1984 and 1985 income tax returns and paid self-employment tax on his USAID income for both years. [19]
*213 One reason USAID may not have withheld any amounts from petitioner's 1984 pay is that petitioner did not file a Form W-4 until February 26, 1985, over a year after he started working for USAID. Petitioner did not file a W-4 when he started work because he believed that he was an independent contractor, and that as such, he was not required to file it. Because of the confusion at USAID with respect to the employment and tax status of PSC's, USAID's controller sent all U.S. citizen PSC's Forms W-4 and SS-8 on February 20, 1985, and asked them to complete these forms. [20] Petitioner then filed the W-4 as requested but claimed thereon that his compensation was exempt from Federal income tax because "I am a self employed consulting engineer and under present regulations do not consider it necessary to file this form". Thereafter, USAID continued to fail to withhold Federal income taxes and social security taxes from petitioner's pay, and did not pay the employer's share of social security taxes. *214 As petitioner acknowledged, Form W-4 is supposed to be executed at the beginning of the employment. If USAID had thought petitioner was an employee when he started work in January 1984, USAID should have insisted then that he complete the Form W-4. Instead, USAID did not know what the employment status of contractors such as petitioner was. It cannot be said that USAID intended to treat petitioner as its employee when it reported his income on a Form 1099-MISC and did not withhold any amounts for income or social security taxes and did not pay the employer's share of social security taxes. This pattern of conduct is in contrast to how USAID and the taxpayers acted in Marckwardt v. Commissioner, supra; Juliard v. Commissioner, supra; and Matt v. Commissioner, supra.
c. Ecuadorean Taxes
Respondent points out that petitioner did not pay any taxes to the Ecuadorean government on his compensation received from USAID. Respondent argues that petitioner should not be allowed the double benefit of exemption from U.S. and Ecuadorean taxes on his USAID income. Whether petitioner would be illegitimately *215 enjoying a double benefit is unclear. There is no evidence that petitioner took inconsistent positions with respect to his status as an employee or independent contractor of an agency of the United States in order to avoid both U.S. and Ecuadorean taxes. Petitioner stated, on brief, that his USAID income was exempt from Ecuadorean tax under the terms of the grant agreement between the United States and Ecuador, which provided that contractors paid pursuant to the agreement would be exempt from any Ecuadorean taxation. Although this provision does not appear to have exempted amounts paid from nongrant funds, such as those paid to petitioner, it was not unreasonable for petitioner, a nonlawyer, to think that his compensation and housing allowance were exempt from Ecuadorean taxation under the bilateral grant agreement between the United States and Ecuador. It may well be that petitioner was liable for Ecuadorean taxes on his USAID income but erroneously failed to pay them. It is also possible that his USAID income was exempt from Ecuadorean taxation for reasons not disclosed by the record. We do not agree with respondent that petitioner is not entitled to the benefit of the section *216 911 exclusion simply because he did not pay Ecuadorean taxes. Rather than muddying the water with questions about Ecuadorean tax law, we focus on section 911 and its applicability to the facts of this case. As we stated in Marckwardt v. Commissioner, supra, there is no statutory prerequisite that a person claiming the foreign earned income exclusion under section 911 pay income tax to a foreign country. Although Congress may not have intended that independent contractors escape both U.S. and foreign taxation, it did not expressly provide that independent contractors, who otherwise qualified under section 911, but who did not pay foreign taxes, would be liable for U.S. income taxes on their foreign earned income. In any event, we believe the case at hand is properly distinguishable from a case where a taxpayer fails to pay foreign taxes on the basis of an affirmative claim of exemption from such taxes on the ground that he is an officer or employee of the United States or an agency thereof. In such a case, the taxpayer would be taking inherently inconsistent positions in order to obtain tax exemptions from different taxing authorities. The preponderance *217 of the evidence shows that petitioner thought he was an independent contractor. He stuck to that position throughout his tenure in Ecuador and has never taken the position for any purpose that he was an employee of the United States or an agency thereof. Whether petitioner was in fact liable for Ecuadorean taxes is beyond the proper scope of our inquiry and we do not address it further. d. Effect of USAID PSC Form
Section 1(b)(1) and (2) of 41 C.F.R., chapter 7, Appendix F (1983), defined a "personal services contract" as "one which establishes an employer-employee relationship," and a "nonpersonal services contract" as "one which establishes an independent contractor relationship." On its face, the contract executed by petitioner and USAID on November 1, 1983 was a personal services contract. Appendix F also provides that it only applies to USAID contracts that establish an employer-employee relationship and that Attachment A (USAID form 1420-36) is designed to establish that relationship. Appendix F states further that it does not apply to nonpersonal service contracts creating an independent contractor relationship. Instead, such contracts are covered under AID Handbook *218 14 -- Procurement Regulations. Petitioner's contract was executed on a form that USAID used for personal service contracts. Although USAID used PSC forms for contractual agreements intended to create employer-employee relationships, it does not logically (or legally) follow that whenever a contract was prepared using that standard form, or that coversheet, an employer-employee relationship was created. Moreover, the testimony of petitioner and Mrs. Bullock has persuaded us that USAID, through neglect, mistake, or for reasons of administrative convenience, used the same standard form in many cases when it intended to hire an independent contractor. If we held that use of USAID's PSC form created a conclusive presumption that an employer-employee relationship existed for Federal tax purposes, as respondent and the USAID regulations suggest, then we would not be properly applying the common law test for determining whether an individual is an employee or an independent contractor. Nationwide Mut. Ins. Co. v. Darden, 502 U.S.    ,    , 112 S. Ct. 1344, 1349 (1992). As courts have repeatedly recognized, there is "no shorthand formula or magic *219 phrase that can be applied to find the answer, * * * all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Id. (quoting NLRB v. United Ins. Co. of America, 390 U.S. 254, 258 (1968)). If there is in fact an independent contractor relationship, the designation or description of that relationship by the parties to the contract as anything else is immaterial. See United States v. Silk, 331 U.S. 704, 715 n.8 (1947). Respondent asks us to pay greater attention to the General Provisions, the boilerplate language attached to, and a part of, the contract as USAID standard form 1420-38, than the Statement of Duties, the provisions actually negotiated by USAID and petitioner. Petitioner has shown the Court that there is nothing in the contract between USAID and petitioner that explicitly states that petitioner was USAID's employee or that USAID had supervisory authority or control over petitioner. While there are some paragraphs in the General Provisions that tend to indicate an employer-employee relationship, they are of relatively little evidentiary weight when taken in *220 context. Moreover, we do not believe that boilerplate controls the outcome when it appears from the facts and circumstances and the negotiated contract provisions that neither party to the contract intended that an employer-employee relationship be created between USAID and petitioner. Delhomme Indus., Inc. v. Houston Beechcraft, Inc., 669 F.2d 1049, 1059 n.25 (5th Cir. 1982) (written and typed contractual terms prevail over conflicting clauses in a printed form contract); see also Farnsworth, Contracts 310-319 (2d ed. 1990) (discussing standardized agreements); Kessler, "Contracts of Adhesion -- Some Thoughts About Freedom of Contract", 43 Colum. L. Rev. 629 (1943). The General Provisions were included because the contract was prepared on a standard PSC form and Appendix F calls for the inclusion of the General Provisions, and not because the parties to the contract believed or intended that petitioner was USAID's employee. e. Additional Factors
We have also considered the other factors under the common law test, such as the source of the instrumentalities and tools, the location of the work, the duration of the *221 relationship between petitioner and USAID, the method of payment, petitioner's profit and loss potential, etc. Nationwide Mut. Ins. Co. v. Darden, supra at 1348; 1 Restatement, Agency 2d, sec. 220(2) (1958); see also Rev. Rul. 87-41, 1987-1 C.B. 296. While there is some evidence that indicates that petitioner was an employee of USAID, there is more that shows he was not. We therefore conclude that petitioner has carried his burden of proving that he was an independent contractor and not an employee of USAID during the years in question. 4. Treatment of Consulting Engineers in Prior Cases
In addition to the facts in the record that establish that petitioner was not an employee of USAID during the years in question, our decision that petitioner was an independent contractor is consistent with a line of cases concerning the employment status of consulting engineers, professionals who typically perform services as independent contractors. Before the Supreme Court reversed its holding in Collector v. Day, 78 U.S. (11 Wall.) 113 (1870), that the Federal Government had no constitutional authority to *222 tax the means, agencies, or instrumentalities of State governments, Graves v. New York ex rel. O'Keefe, 306 U.S. 466 (1939); Helvering v. Gerhardt, 304 U.S. 405 (1938), the compensation received by officers and employees of State and local governments was exempt from Federal taxation. War Revenue Act of 1917, ch. 63, sec. 201, 40 Stat. 303; T.D. 2843, 1919-1 C.B. 93. In the effort to take advantage of this exemption, consulting engineers working for State and local governments on various engineering projects used to claim that they were officers or employees of such governments. In Metcalf & Eddy v. Mitchell, 269 U.S. 514 (1926), the Supreme Court held that two consulting engineers were not employees of the United States or the District of Columbia or of any State government, but were independent contractors. As a result, these engineers were not entitled to the tax exemption provided in the War Revenue Act for State employees. With respect to the engineers' status as employees, the Supreme Court stated: So far as appears, they were in the *223 position of independent contractors. The record does not reveal to what extent, if at all, their services were subject to the direction or control of the public boards or officers engaging them. In each instance the performance of their contract involved the use of judgment and discretion on their part and they were required to use their best professional skill to bring about the desired result. This permitted to them liberty of action which excludes the idea that control or right of control by the employer which characterizes the relation of employer and employee and differentiates the employee or servant from the independent contractor. [Id. at 520-521.]
See also Fuller v. Commissioner, 9 B.T.A. 708 (1927). More recently, in Abrahamson v. Commissioner, T.C. Memo. 1978-26, this Court found that a consulting engineer who worked as an adviser/consultant supervising well work for a gas company was not an employee but an independent contractor subject to self-employment tax under section 1401. As these cases demonstrate, sole proprietor consulting engineers are commonly treated as *224 independent contractors when they are hired to monitor or supervise construction projects and thus enjoy the tax benefits and bear the tax burdens associated with that status. 5. Conclusion
Inasmuch as we have found that petitioner was not an employee of the United States or an agency thereof during the years at issue, he is entitled to the foreign earned income exclusion under section 911(a). Therefore, the entire amount of compensation petitioner received from USAID during the taxable years 1984 and 1985, including the housing cost allowance, is excluded from his gross income under section 911(a), and there are no deficiencies in petitioners' Federal income tax for the taxable years 1984 and 1985. B. Section 6653(a): Negligence
Respondent also determined that petitioner is liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations for the years 1984 and 1985. Inasmuch as we have held that, under section 911(a), petitioner is entitled to exclude from his gross income all the compensation and housing costs allowances he received from USAID while working in Ecuador in 1984 and 1985, there is no underpayment *225 in petitioners' Federal income tax for 1984 or 1985. Therefore, petitioners are not liable for the additions to tax provided under section 6653(a)(1) and (2) for either year. Sec. 6653(c). Cf. Marckwardt v. Commissioner, T.C. Memo. 1991-347 (negligence addition not sustained); Juliard v. Commissioner, T.C. Memo. 1991-230 (same). To reflect the foregoing, Decision will be entered for petitioners. Footnotes
1. 50% of the interest due on $ 16,128.50.↩
2. 50% of the interest due on $ 12,507.29.↩
1. "El Nino" is a severe weather pattern marked by strong ocean winds and currents that causes tremendous flooding as well as drought. El Nino, Spanish for "the child", typically begins around Christmas and can last for months. In 1982 and 1983, El Nino's winds and rains devastated South America causing billions of dollars in damage in Peru, Ecuador, Bolivia, Argentina, Brazil, and Paraguay. Ecuador alone received 12 feet of rain over an 8-month period beginning in November 1982.↩
2. The implementing agencies, or "implementing institutions", were the Ecuadorean governmental agencies that actually performed or directly oversaw the rehabilitation work.↩
3. In carrying out these duties, petitioner was performing the conventional duties of a consulting engineer engaged in "field engineering" by: (1) Making periodic visits to the site to observe the work in progress, and providing appropriate reports to the Client; (2) Observing initial operation of the project, or of performance tests required by specifications; and (3) Making a final inspection and report of the completed project, with the Client or his representative.
Petitioner also provided "special services" to BEDE and USAID in the form of: b. Studies, tests, and process determination performed to establish design criteria for water and waste treatment facilities; * * * f. Technical observation of construction by a full-time resident project engineer * * * as required, who will: (1) Review and approve requests for monthly and final payments to contractors; (2) Issue certificates of completion to the Client on completed construction contracts; and (3) Provide record drawings of the completed project.
American Society of Civil Engineers, Manual No. 45, "Consulting Engineering: A Guide for the Engagement of Engineering Services" at 13 (1972).↩
4. On Apr. 1, 1984, these provisions were recodified as part of the Federal Acquisition Regulations at 48 C.F.R., chapter 7, Appendix D, but were not substantively revised until 1986.↩
5. USAID did not pay the this amount for either of the taxable years in issue.↩
6. Standard Form 1034 -- Public Voucher for Purchases and Services Other than Personal.↩
7. Form SS-8 (Determination of Employee Status for Purposes of Federal Employment Taxes and Income Withholding) is a 4-page form that "firms" and "workers" can use to obtain a determination from the IRS as to the status of a particular worker for purposes of Federal employment and income taxes.↩
8. Housing cost allowances received by U.S. citizens working as independent contractors overseas are exempt from Federal income tax under sec. 911 to the extent they do not exceed certain limitations. Such allowances received by Government officers and employees working overseas are also exempt from tax under sec. 912.↩
9. Sec. 911(a) provides for an exclusion from gross income of foreign earned income at the election of a qualified individual. In order to exclude his USAID income but still disclose what he was doing on his returns, petitioner reported the income he received from USAID as ordinary income, claimed an offsetting deduction↩, and attached Form 2555 to elect and compute the "exclusion".
10. In computing the "net earnings from self-employment" the sec. 911(a)(1) exclusion does not apply. Sec. 1402(a)(11).↩
11. Petitioner's receipt of pay from a U.S. Government agency does not mean that it was not received "from sources within a foreign country". Sec. 1.911-3(a), Income Tax Regs., provides that "Earned income is from sources within a foreign country if it is attributable to services performed by an individual in a foreign country or countries." In 1985, the Treasury promulgated new regulations under sec. 911 that apply to both years in issue. T.D. 8006↩, 50 Fed. Reg. 2966 (Jan. 23, 1985).
12. The common law test articulated by the Supreme Court in Nationwide Mut. Ins. Co. v. Darden, 502 U.S.    ,    , 112 S. Ct. 1344, 1348 (1992) is also consistent with the common law tests outlined in Rev. Rul. 87-41, 1987-1 C.B. 296, 298-299 and 1Restatement, Agency 2d, sec. 220 (1958); see infra↩ note 13.
13. 1 Restatement, Agency 2d, sec. 220 (1958), defines a servant as: (1) * * * a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of an employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.↩
14. Respondent objected to petitioner's introduction of ASCE Manual No. 45 as irrelevant. We overrule that objection under Fed. R. Evid. 401 and 402↩ because we find that the manual explains the nature of petitioner's profession, it tends to show what petitioner believed his employment status to be, and it sheds light on how consulting engineers are generally treated in the ordinary course of their activities.
15. We also conclude that respondent's exhibit O is not admissible under the "catch-all exception", Fed. R. Evid. 803(24)↩ because it does not possess any circumstantial guarantees of trustworthiness and petitioner did not receive sufficient notice of its existence or respondent's intent to use it.
16. See infra↩ note 20 and accompanying text.
17. Even if we had admitted respondent's exhibits O and P we would have reached the same result in this case as we do excluding them. In addition to being hearsay, these documents have little evidentiary weight, were written over 4 years after petitioner left Ecuador, and were prepared in the course of an IRS audit of PSC's that exposed irregularities at USAID concerning the employment status of some contractors.↩
18. In Marckwardt v. Commissioner, T.C. Memo. 1991-347 n.9, we noted the fact that the taxpayer had claimed the sec. 911(a) exclusion as an independent contractor of USAID but had not paid self-employment taxes. See sec. 1402(a)(11); see also supra↩ note 10.
19. Employees do not pay self-employment tax on their wages, tips, and salaries. Instead, social security taxes under the Federal Insurance Contributions Act (1954) (FICA), ch. 21, 68A Stat. 415, secs. 3101-3128, are imposed with respect to the wages of an employee. Sec. 3102. The employer is obligated to pay one-half of the employee's FICA taxes, sec. 3111(a) and (b), and also is liable for the employee's one-half portion, which is to be withheld from the latter's wages. Sec. 3102(b); cf. sec. 3509 (employer's liability limited in cases where employer treats individual as an independent contractor).↩
20. Respondent has objected on hearsay grounds to the evidence petitioner presented on USAID's confusion. Petitioner offered two memoranda: One written by the USAID controller to all U.S. citizen PSCs dated Feb. 20, 1985, and another by Jan Miller, USAID's Assistant General Counsel for Employee and Public Affairs, to USAID regional legal advisers dated Feb. 24, 1989, acknowledging that there was confusion at USAID about the employment and tax status of PSC's. (Exhibits 18 and 19) We, however, overrule respondent's hearsay objections under Fed. R. Evid. 803(24)↩. The memoranda were not written in contemplation of litigation; they are general in nature; and they are offered for the purpose of proving USAID's state of mind with respect to the tax treatment of PSCs. These memoranda are not specific in nature and do not address the employment or tax status of any particular individual. In addition, respondent received copies of the memoranda before trial, and there is no other documentary evidence in the record that is more probative on this point than these memoranda. Transcript at 29-38.